<pre>
 1                     UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3  IN RE:                          ) Case No. 12-13262 (BLS)
                                    ) Chapter 11
 4  REVSTONE INDUSTRIES, LLC,       ) Related to Docket No. 156
                                    )
 5  _____Debtor,        )
    In re:                          ) Case No. 12-13263 (BLS)
 6                                  ) Related to Docket No. 67
    SPARA, LLC,                     )
 7                                  ) February 6, 2013
                        Debtor,     ) 10:30 A.M.
 8  In re:                          )
                                    ) Case No. 13-10027 (BLS)
 9  GREENWOOD FORGINGS, LLC,        ) Related to Docket No. 70
                                    )
10  _____Debtor,        )
    In re:                          ) Case No. 13-10028 (BLS)
11                                  ) Related to Docket No. 19
    US TOOL AND ENGINEERING, LLC    )
12                                  ) Courtroom No. 1
                        Debtor,     ) 824 Market Street
13  _____) Wilmington, Delaware 19801

14

                          TRANSCRIPT OF HEARING
15             BEFORE HONORABLE BRENDAN L. SHANNON
                  UNITED STATES BANKRUPTCY JUDGE
16

    APPEARANCES:
17

    For the Debtors:          Pachulski Stang Ziehl & Jones
18                            By:  LAURA DAVIS-JONES, ESQUIRE
                              919 North Market Street, 17th Floor
19                            Wilmington, Delaware 19801

20                            By:  ALAN KORNFELD, ESQUIRE
                              10100 Santa Monica Boulevard
21                            13th Floor
                              Los Angeles, CA 90067-4003
22
    For the Committee:        Womble Carlyle
23                            By:  MATTHEW WARD, ESQUIRE
                              MARK DESGROSSEILLIERS, ESQUIRE
24                            THOMAS HORAN, ESQUIRE
                              222 Delaware Avenue
25                            Wilmington, Delaware 19801


    ECRO:                     DANA MOORE
</pre>

```
Transcription Service:   Reliable
                         1007 N. Orange Street
                         Wilmington, Delaware 19801
                         Telephone:  (302) 654-8080
                         E-Mail:  gmatthews@reliable-co.com
Proceedings recorded by electronic sound recording;
transcript produced by transcription service.



For the Hofmeister        Pension Benefit Guaranty Corp.
Trust:                    By:   HOMER MCCLARTY, ESQUIRE
                          24400 Northwestern Highway
                          Suite 204
                          Southfield, Michigan 48075

For Boston Financial
Group:                    DLA Piper
                          By:   GREGG GALARDI, ESQUIE
                          1251 Avenue of the Americas
                          New York, NY 10020-1104

                          By:   STUART BROWN, ESQUIRE
                          919 North Market Street, Suite 1500
                          Wilmington, DE 19801

For Ascalon Enterprises: Kenneth R. Beams PLLC
                          By:   KENNETH R. BEAMS, ESQUIRE
                          3338 Prairie Avenue
                          Royal Oak, MI 48073

For George Hofmeister:    Law Offices of Sheldon Toll
                          By:   SHELDON TOLL, ESQUIRE
                          2000 Town Center
                          Southfield, Michigan 48075
```

1                              INDEX

2                                                        Page

NOTICE OF AGENDA MATTERS:
3  For Revstone Industries, by Ms. Laura Davis-Jones      4,62
   For the Committee, by Mr. Mark Desgrosseilliers        8,58
4  For the Committee, by Mr. Matthew Ward                13,17
   For George Hofmeister, by Mr. Sheldon Toll               16
5  For the Committee, by Mr. Thomas Horan         23,25,27,30
   For the Hofmeister Trust, by Mr. Homer McClarty          24
6  For Ascalon Enterprises, by Mr. Kenneth Beams            29
   For BFG, by Mr. Gregg Galardi                         35,47
7  For the Debtors, by Mr. Alan Kornfeld                    39
   For BFG, by Mr. Stuart Brown                             62

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.  Ms. Jones.

3          MS. DAVIS-JONES:  Thank you, Your Honor, good

4   morning.

5          THE COURT:  Good morning.

6          MS. DAVIS-JONES:  For the record Laura Davis-Jones

7   of Pachulski Stang Ziehl & Jones on behalf of Revstone

8   Industries and related Debtors.  Your Honor, I am standing

9   before you today, my first hearing as Debtors counsel in this

10  case.  Your Honor, I monitored a hearing in this case back on

11  January 9th and obtained a sense of the case dynamic.  It was

12  not until January 17th, Your Honor, approximately a little

13  over six weeks into the case that we've been brought in now

14  as Debtors counsel.

15         Your Honor, our retention followed two significant

16  events that happened a little earlier in the day on January

17  17th.  One was the appointment of two independent managers to

18  the board of managers and the retention of a chief

19  restructuring officer.  Your Honor may recall that the Debtor

20  Revstone Industries and Spara are the parent companies of

21  their respective corporate groups.  Each of these two parent

22  company Debtors now has a three person board of managers.

23  The three individuals on that board are George Hofmeister,

24  plus Richard Newsted and James Shine.  And if I can, Your

25  Honor, I would like to approach and just show you the CD's of

1  the two independent directors.

2         THE COURT:  Very good.  Thank you.

3         MS. DAVIS-JONES:  Your Honor, decision regarding

4  bankruptcy or restructuring affecting the Debtors and their

5  subsidiaries including the sales of assets have been

6  delegated to a restructuring committee composed of Mr.

7  Newsted and Shine and to the CRO.

8         Your Honor, John DiDonato of Huron Consulting, an

9  established national consulting firm is the CRO.  Mr.

10  DiDonato is here at the end of counsel table.  And he is

11  president of the two parent company Debtors.  And reports to

12  and is under the supervision of the restructuring committee.

13  Mr. DiDonato is a well known consultant serving as CRO and

14  financial advisor in this industry for over 25 years.

15         Your Honor, this structure has been duplicated for

16  the other two Debtors Greenwood Forgings and US Tool &

17  Engineering, as well as two non-Debtor Revstone Tool &

18  Engineering and Revstone Transportation.  To implement these

19  changes the LLC agreements of the six companies were amended.

20  Under the amendments the boards and managers have made an

21  exclusive delegation of power and authority to the

22  restructuring committee.  Only the restructuring committee

23  made up of the two independent managers can make decisions

24  related to the Chapter 11 case, the process, the

25  restructuring of the company or any and all related matters.

1          As part of the corporate governance change, George

2    Hofmeister no longer has officer functions at the Debtors or

3    subsidiaries in the U.S.  And he is being replaced on the

4    board of directors or local equivalence of the four Mexican

5    subsidiaries and at the Canadian entities.  Your Honor, those

6    took us a little bit more time and we're working through

7    those.

8          As a result of these steps for each of the companies

9    in the Revstone Industries and Spara Corporate Groups, John

10   DiDonato under the governance of the restructuring committee

11   is either the president and CRO or by reason of being the

12   president and CRO of the sole member of an LLC or sole

13   shareholder of a corporation has power to direct management

14   to elect a board that directs managements such as in these

15   foreign entities.

16         So we now have a board of managers, dominated by

17   independent members and we have a CRO.  We have new Debtors

18   counsel, now for all four Debtors and we have moved to

19   administer the cases jointly for procedural purposes.  Your

20   Honor, we will be filing retention applications for our firm

21   and for Mr. DiDonato's firm soon.

22         Your Honor, we have put a lot of focus during the

23   last two and a half weeks not only on governance, but also on

24   opening lines of communication and providing information.

25   Mr. DiDonato and I have met with the Committee professionals.

1  We have provided a ton of information to the Committee that

2  they were seeking.  And we have started intensive efforts on

3  an effort to develop a road map for what we believe can be a

4  very successful and prompt exit from Bankruptcy.

5          Against the backdrop of what we modestly submit has

6  been much progress over the last several weeks, we have the

7  Committee's angst and frankly anger directed at Mr.

8  Hofmeister which has culminated disappointingly, but not

9  surprisingly in a Trustee motion filed late Monday night.

10  The motion is scheduled for a hearing on March 19th.  And the

11  rule of this case I expect will have developed and progressed

12  a lot by then, but it is good to see, frankly in a little bit

13  of a disappointing way, that the motion is premised in

14  observations and issues that the Committee talked about early

15  in this case their distrust of Mr. Hofmeister.

16          The motion clearly dates back in time and appears to

17  be a progression of the Chairman of The Committee

18  unsuccessful attempts of collecting money from Mr.

19  Hofmeister.  We believe that we will be able to suade Your

20  Honor that there is no basis for the appointment of a trustee

21  in these cases, but that remains to be heard in March.  Your

22  Honor, in the interim we are excited to be in the case.  We

23  believe these cases show great promise.  And we hope that we

24  are able to convince others to work with us to maximize value

25  then to rather continue with punishment and litigation.

1          Your Honor, there is a brief agenda that we have

2    before the Court today.  It's a limited agenda.  The first

3    matter on it, Your Honor, has already entered the order.

4          THE COURT:  Right.

5          MS. DAVIS-JONES:  The second, Your Honor, is the

6    motion for joint administration which I mentioned seeking

7    strictly, Your Honor, from a procedural basis to administer

8    these four cases.  And, Your Honor, I don't think anyone had

9    anyone had any objection to that.

10          THE COURT:  No, I regard it as routine.  Does anyone

11    wish to be heard with respect to joint administration?  Okay,

12    I'll take the order.

13          MS. DAVIS-JONES:  Thank you.

14          THE COURT:  Okay, I've signed the order.  We'll have

15    that on the docket.

16          MS. DAVIS-JONES:  Your Honor, the next four motions

17    are motions brought by the Committee and I'll yield to them.

18          THE COURT:  Very good.  Mr. Desgrosseilliers.

19          MR. DESGROSSEILLIERS:  Good morning, Your Honor,

20    Mark Desgrosseilliers, Womble Carlyle Sandridge & Rice on

21    behalf of the Official Committee of Unsecured Creditors at

22    Revstone.  Matter number 3 on the agenda is the retention of

23    FTI Consulting Inc.  Your Honor, FTI was chosen by the

24    Committee about two days after they were formed.

25          THE COURT:  Right.

1        MR. DESGROSSEILLIERS:  We filed the objection

2   deadline I think about 25 days --

3      [Phone Interruption]

4        THE COURT:  Operator, this is Judge Shannon, if we

5   have another interruption I'm going to terminate the call.

6   You may proceed.

7        UNKNOWN:  Okay, thank you, Your Honor.

8        THE COURT:  Very good.

9        MR. DESGROSSEILLIERS:  Thank you, Your Honor, sorry

10  about that.

11       THE COURT:  It's not your fault.

12       MR. DESGROSSEILLIERS:  We filed the retention

13  application.  FTI was chosen by the Committee.  There was

14  extensive arms length negotiation with respect to FTI's

15  retention.  I think we were able to resolve most of the

16  concerns that were expressed to us by both the United States

17  Trustee and by the Debtors through Ms. Jones's firm.

18       There was one issue that remains unresolved, Your

19  Honor.  I know Your Honor has probably read the FTI retention

20  app, but there is just one issue and it's basically on the

21  recoveries that FTI, we get a percentage of certain

22  recoveries, from what I know in all fairness on specified,

23  for actions that may be brought ultimately to bring assets

24  into the estate.

25       THE COURT:  Okay.

1    MR. DESGROSSEILLIERS:  And I think I want to

2  characterize Ms. Jones's objection, it was pretty short,

3  pretty brief and to the point.  It's just that that

4  particular issue that I think is in front of Your Honor with

5  respect to their retention.

6    THE COURT:  Well it seems like a contingency fee in

7  one?

8    MR. DESGROSSEILLIERS:  It sort of is, Your Honor,

9  and I think what was asked of us was in this thing a 330

10  review, a sort of look back review for the Debtors which FTI

11  was not agreeable to doing and was not part of their

12  engagements.  It's not what we agreed to when we engaged

13  them.  They agreed to a fixed fee of 85,000 and they agreed

14  to this variable fee under 328.  And that was the deal that

15  we cut with FTI.  That was the terms of their engagement and

16  that's the terms that the Committee thought was reasonable

17  and fair.

18    With respect to the variable completion fee it is,

19  and as much as we would like to try to resolve this

20  consensually, it is difficult, and not possible for the

21  Committee right now to provide an estimate of how much these

22  potential actions might yield and who they might be brought

23  against.  We just don't have the information, Your Honor.

24  We're not really at that standing point where we have the

25  standing to pursue those actions.  There will be

1   investigations of those actions, but without that information

2   I think we can't, nor should we be expected to provide any

3   estimate of what those actions are and how much they bring.

4           THE COURT:  But in fairness you're asking me to

5   bless it?

6           MR. DESGROSSEILLIERS:  I understand, Your Honor.

7           THE COURT:  Yeah, I'm not going to go with it.  I

8   would approve it subject to a 330.  And the reason is, and I

9   want to be clear that it's not a criticism, there is a lot of

10  storm and drum so far in this case and we'll deal with that.

11  This is nothing about FTI or about the issues in this

12  particular case.  I looked carefully at the application.  I

13  think I understand the context in which it's being submitted,

14  but I frankly don't have enough information to give me a

15  measure of confidence.

16          There is certainly places where Section 328 is

17  appropriate and I have approved it on many, many occasions,

18  but usually then I've got a sense of the construct in which

19  the fee would be earned, and from that an understanding that

20  it can't be determined or it falls into the category that

21  Section 328 designed to protect, which is usually from

22  backside scrutiny where somebody says look, you know, this

23  was all upside, you didn't do anything for this.  And I

24  understand the market considerations that make 328

25  appropriate.

1          In this case you've identified that these are for

2   potential recoveries on litigations that you don't yet have

3   or currently have standing to bring that are at this stage of

4   the case difficult for me to grasp.  So I would not be

5   prepared to approve this with the limited review that Section

6   328 contemplates.  So I think you can talk to FTI about it.

7   I am confident how that conversation will go, but I think

8   that the concern with respect to the 330 review is well

9   founded. I would also observe that, you know, with the issue

10  being brought to me I probably would have raised this with or

11  without a Debtor objection, okay.

12          MR. DESGROSSEILLIERS:  Understood, Your Honor.  We

13  will have that discussion with FTI.  I assume we will have a

14  chance at some point during this hearing.

15          THE COURT:  Sure.

16          MR. DESGROSSEILLIERS:  I suspect we will be able to

17  submit an order to Your Honor.  I think the next matter, and

18  Your Honor referenced sort of the storminess of this

19  particular case.  I didn't think it was appropriate to stand

20  up and respond to Ms. Jones's characterization.  I didn't

21  want my silence to be interpreted as articent to any

22  characterization of a pending motion.  There may be an

23  appropriate time today for us to address that, Your Honor.

24  I'm giving you a forewarning that you may yet hear from me

25  again about that, but I don't think it's yet the time.

1     The next matter up is our retention which

2  unfortunately is also a contested matter.  My colleague

3  Matthew Ward will be handling that so I would turn the podium

4  over to him.

5          THE COURT:  Okay, Mr. Ward.

6          MR. WARD:  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. WARD:  Matthew Ward of Womble Carlyle for the

9  proposed counsel for the Committee.  Your Honor the standard

10 for Committee Counsel is in 1103.  An 1103 fee says that an

11 attorney while employed by such Committee may not represent

12 any other entity having an adverse interest in connection

13 with the case.  That's not what we have done here, Your

14 Honor.  As you will see, and I'm sure Your Honor has read, we

15 submitted an extensive affidavit in support of our retention

16 application.  The affidavit was 36 pages long and it listed

17 literally hundreds of parties that we ran through our complex

18 data base.  We disclosed every single connection at which we

19 were aware at the time.

20         Mr. Hofmeister's objection suggests that Womble

21 prior to the petition date represented the Debtor in

22 connection with the domestication of a judgment in South

23 Carolina.  Your Honor, we don't think that statement is an

24 accurate reflection of the facts.  We think that at the time

25 we were doing work for Chicago Miniature Lighting, which we

1   did disclose in our affidavit, and we had an ongoing

2   relationship with Chicago Miniature Lighting prior to the

3   petition date.  And in connection with that service for

4   Chicago Miniature Lighting we were approached by in house

5   counsel for Chicago Miniature Lighting who also happened to

6   be in house counsel for the Debtor.

7         In house counsel asked us and said we have an issue

8   with respect to a domestication of a judgment in South

9   Carolina.  Do you guys have an office in South Carolina and

10  we said that we did.  We referred the matter to one of our

11  South Carolina lawyers to provide some suggestions with

12  respect to how to proceed in connection with that

13  domestication.  At no time did we think we were representing

14  the Debtor.  We did not run the Debtor through conflicts. We

15  did not have an engagement letter with the Debtor, and we

16  were not asked for an engagement letter with the Debtor.  We

17  thought we were doing a courtesy service for our existing

18  client Chicago Miniature Lighting.

19        It is our position, Your Honor, is that we did not

20  have ever a relationship with this particular Debtor, an

21  attorney/client relationship.  Perhaps equally as important,

22  Your Honor, even if we did have a relationship with the

23  Debtor that relationship terminated prior to the petition

24  date.  The objection raised by Mr. Hofmeister itself suggests

25  that we rendered services in July and August of last year.

1  We were not engaged as proposed counsel until December of

2  this year.  So it was a prior representation.  And in fact

3  necessarily it ended prior to the petition date because any

4  further action by the Secured Creditor in that case or the

5  alleged Secured Creditor in that case would be stayed.

6          The one other thing to point out, Your Honor, is

7  even if we were rendering legal advice for the Debtor in

8  connection with domestication of a judgment, that's not

9  adverse to the Debtor.  In fact the Debtor would be looking

10 at that as would we as proposed counsel for the Committee.

11 So we don't see a conflict.  We think we meet the standard

12 under 1103(b).  And we would respectfully request Your Honor

13 to enter the order.

14          THE COURT:  Okay, response.  Mr. Toll, good morning.

15          MR. TOLL:  Good morning, Your Honor, for the record

16 Sheldon Toll, attorney for George Hofmeister.  Our objection

17 attached an invoice showing a bill by Womble to Revstone

18 Industries LLC in December 2009 with client number 60818.  In

19 the original 37 page application there was no mention that

20 Womble had represented Revstone at least in 2009.  And in the

21 supplemental declaration there was no mention of that.  That

22 is completely glossed over.  That is point number one, Your

23 Honor.

24          Point number two, is that our objection attached a

25 declaration of James O'Toole who is deputy general counsel of

1  Revstone.  I assume --

2          THE COURT:  John or James?

3          MR. TOLL:  James.

4          THE COURT:  All right because it's John on the

5  invoice.

6          MR. TOLL:  I see that they list him as John, but

7  it's James.  But the declaration was by James O'Toole.  And

8  his declaration specifically states that the domestication of

9  judgment issue that's being referred to here was an attempt

10  by Boston Finance Group to domesticate its judgment against

11  Revstone and other companies in South Carolina.

12          Mr. Desgrosseilliers's supplemental declaration

13  talks about a domestication of judgment.  He's not specific

14  about that, but that's the specific one that Mr. O'Toole is

15  talking about in his declaration.  So what we have here, Your

16  Honor, is a situation where before Bankruptcy the Debtor

17  conferred with Womble about the Debtors' issues with a

18  domestication of a judgment by Boston Finance Group which is

19  the judgment that precipitated this Bankruptcy filing and

20  which is the largest debt in this case.  And now Womble is

21  saying we want to represent the Committee, the chairman of

22  which is Boston Finance Group against Revstone.  If this

23  isn't a conflict of interest I don't know what a conflict of

24  interest is.  I respectfully submit, Your Honor that this is

25  a conflict of interest and the Court should take appropriate

1  action.  Thank you.

2          THE COURT:  Mr. Ward.

3          MR. WARD:  Your Honor, the invoice that they

4  attached to the affidavit that was addressed to Revstone

5  Industries, that client number 60818, that's the Chicago

6  Miniature Lighting client number.  And again I've already

7  mentioned that Mr. O'Toole was in house counsel for both

8  entities.  That was in connection with what we were doing for

9  Chicago Miniature Lighting three years before the petition

10 date.  And the fact that we sent the invoice to Revstone

11 Industries is irrelevant.

12         The sending of an invoice does not create an

13 attorney/client relationship, an engagement letter does.  And

14 I have the engagement letter with Chicago Miniature Lighting.

15 And in fact that engagement letter says to the extent that

16 your firm renders further services to Chicago Miniature

17 Lighting or anybody else for that matter is to be confirmed

18 in writing through a subsequent engagement letter. And there

19 was never an engagement letter with Revstone Industries.

20 They were not our client.

21         THE COURT:  Let me ask you a question so that I

22 understand Mr. Toll's point.  I think the fact pattern that

23 he's just laid out is that Boston Financial had a substantial

24 judgment which we have discussed and which is a feature of

25 this case.  Boston Financial was attempting to domesticate

1  that judgment to pursue recovery on that judgment.  I believe

2  his statement was that Womble was engaged by the Debtor to

3  provide advice to the Debtor with respect to the consequences

4  or the act of domestication of that judgment and did so, and

5  now seeks to serve as Committee in a case where the judgment

6  is a major precipitating factor.  I think that's how I line

7  up your argument, Mr. Toll, is that an accurate statement?

8          MR. TOLL:  Yes, Your Honor.

9          THE COURT:  Okay and so then his point was if that's

10 not a conflict then how do I deal with that?  Do I have that

11 right?  Is that fact pattern accurate?

12         MR. WARD:  Well the fact pattern is inaccurate.  I

13 think your characterization of Mr. Toll's argument is

14 accurate, but we do not represent the Debtor in connection

15 with the services.  We do not have an engagement letter with

16 the Debtor.  We were rendering services for Chicago Miniature

17 Lighting.  We were approached by in house counsel for Chicago

18 Miniature Lighting.  We did not know that he was in counsel

19 for Revstone, so no attorney/client relationship.  Even if

20 there was an attorney/client relationship, Your Honor, under

21 the circumstances it doesn't matter for a couple of reasons.

22         Number one, we were adverse to Boston Finance Group

23 and in connection with their judgment in these cases we are

24 going to investigate their liens.  We are going to be adverse

25 to Boston Finance Group with respect to the domestication of

1  their liens.  Moreover, the domestication in South Carolina

2  is not a significant issue in this case.  I don't think the

3  Debtor even has assets in South Carolina.  Revstone

4  Industries is a holding company and the only asset it has is

5  stock.

6        THE COURT:  Okay, here's what I want.  First I've

7  carefully read Mr. Desgrosseilliers's further submission, but

8  frankly I'd like a little bit more meat on the bone.  And I

9  would like a supplemental submission.  Mr. Toll, you'll have

10 an opportunity to respond to it, but I'd like it in the very

11 near term, say have the process wrapped up within a week or

12 10 days.  I'd like a further submission from you folks that

13 lays out in sufficient clarity for me the fact patter, the

14 parties respective positions with respect to what services

15 were provided and when, who was engaged, what was the nature

16 of the relationship.

17        There is three rules about Bankruptcy engagement or

18 retention are disclosed, disclose, disclose.  We are in the

19 process or we are reviewing the sufficiency of the

20 disclosure.  Once the disclosures are made then the

21 determination is whether or not the relationships are

22 sufficient to permit engagement or to require

23 disqualification.  And obviously the engagement standards

24 under 327, and 1103, and 330 are among the highest standards,

25 but the threshold proposition is that I need to make sure

1  that I have adequate disclosure.  And I believe that your

2  firm has made a series of disclosures.  I don't necessarily

3  quarrel with them, but I think what I need is an

4  understanding in terms that I can make sure that I can grasp,

5  both what the fact pattern is and then I think I would

6  benefit from some guidance on the law.  This would be an

7  easier question I will tell you at least or more in a comfort

8  zone for Bankruptcy Court if this were a dynamic that we were

9  having with Debtors counsel.

10       All right, an engagement of Committee counsel, I

11  mean I've run into this issue a little bit, but it's always

12  squirrely.  I mean a Committee counsel you have issues with

13  prior relationships, but actually the Committee doesn't exist

14  until prior to counsels appointment.  You have all these

15  other issues about their not representing; they are

16  emphatically not representing the individual members of the

17  Committee.  They have a fiduciary obligation and to be

18  directly adverse to their constituent members.

19       I've represented Committees and we've dealt with

20  this issue.  So navigating that proposition is an interesting

21  question.  And there is some case law that provides us with

22  some guidance, but I think what I'd like, you know, I've

23  looked at your initial submission which looks standard and

24  I've looked at Mr. Desgrosseilliers's further submission.

25  What I have is a substantive objection that your

1  relationships are such that you are not eligible to serve as

2  Committee counsel.  I'd like you to provide me with a little

3  bit more guidance on that proposition.  And I do want Mr.

4  Toll to have an opportunity to respond.

5       I don't want a further hearing on this.  I don't

6  need evidence.  I don't need witnesses.  I don't need

7  testimony at least at this stage.  Whatever happened,

8  happened.  Whatever services were provided were provided.

9  And to your point, Mr. Ward, and I think you touched on it,

10  there is a qualitative aspect.  I don't know if it's

11  qualitative or quantitative, but the significance of the

12  prior relationship is an important consideration for the

13  Court.  And you've touched on it, but I'm not sure that I can

14  really draw that much from Mr. Desgrosseillers's supplemental

15  affidavit to say whether or not this was a meaningful and

16  significant representation.

17       And again if this were to add additional facts,

18  obviously I'm freelancing here, but if this were a situation

19  where your firm had been retained to provide sustentative,

20  active, heavy lifting advice in how to go to war with, or

21  stiff arm, or fight with Boston Financial that would

22  complicate your ability to serve as Committee counsel just

23  because of the nature of the relationships and that guidance.

24  What you're telling me is it was materially different from

25  that.  I understand.  I'm not trying to complicate the fact

1 of the matter, but I think that Mr. Toll has raised some

2 issues.  I would appreciate more clarity on how we got here

3 and I want to deal with it promptly, okay.

4        MR. WARD:  Okay, if I could have a minute, Your

5 Honor.

6        THE COURT:  Yeah, I'm going to ask that you and Mr.

7 Toll confer on a schedule, on a timeline.  I don't need an

8 order or anything else.  You can figure out what your

9 schedules are, get me submissions.  I'm not looking for

10 anything tremendously elaborate.  And I'm thinking about

11 something in the very near term, but sure, feel free to

12 confer.

13        MR. WARD:  Thank you.  All right, thanks, Your

14 Honor.

15        THE COURT:  All right, so you guys will confer.  The

16 one thing that I would ask is once you've got that done send

17 me the two together and send a set directly to Chambers with

18 a heads up that it's something I need to deal with.  It

19 relates to this matter that's pending because obviously I

20 don't want this to get lost, okay.

21        MR. WARD:  Okay.  I'm wondering, Your Honor, if we

22 should maybe not file these on the Docket.  I don't know if

23 that's what you were suggesting as opposed to us sending it

24 directly to Chambers.

25        THE COURT:  No, I think they can get docketed.

1       MR. WARD:  You just want the copy to come to your

2  attention?

3       THE COURT:  Yeah, otherwise as a general proposition

4  and you know this, I mean I don't get anything you file until

5  it shows up either by binders or by hard copies coming up.

6  And this is something that once the submissions are made, and

7  again I'm not looking for all the bells and whistles of a

8  completion of briefing, but once the submissions are made I

9  would regard the matter as ready for me to review and rule

10  upon.  So again I just want to know that it's coming.  It's

11  nothing more elaborate than that.

12       MR. WARD:  Okay, thanks, Your Honor.

13       THE COURT:  And again you can work out the timing of

14  it at your convenience, all right.

15       MR. WARD:  Thank you.

16       THE COURT:  Very good.  Mr. Horan.

17       MR. HORAN:  Good morning, Your Honor, Thomas Horan

18  from Womble Carlyle Sandridge & Rice for proposed counsel to

19  the Committee.  I'm here to address the two 2004 motions that

20  are on the agenda for today.  I'll deal with the Children's

21  Trust motion first because that one is going to be much

22  easier for the Court.  If I may approach, Your Honor, I have

23  a --

24       THE COURT:  Thanks.

25       MR. HORAN:  Your Honor, what I just gave you are

1  clean and redlines of a form of order.  Yesterday we had a

2  conversation with Mr. McClarty who is the newly appointed

3  Trustee for the Trust.  And we discussed a resolution of it

4  and are happy to say that we've come to a resolution.

5        Under this form of order that I just gave you the

6  discovery that we're seeking, the documented production will

7  be completed by March 8th and it will be produced to our

8  offices here in Wilmington.  And we have a target date of

9  March 29th for depositions, but that's a date that the

10  Committee and Mr. McClarty can work on if they need a more

11  convenient time.  I believe that Mr. McClarty is on the phone

12  if he'd like to address the Court, but otherwise I'd ask that

13  the Court enter the order please.

14        THE COURT:  Sure.  All right, counsel do you have

15  anything to add, sir?  I do have the form or order clean and

16  blacklined.

17        MR. MCCLARTY:  Good morning, Your Honor, Homer

18  McClarty appearing on behalf of the Megan, Scott and Jamie

19  Hofmeister Trust.  I did have a conversation with Mr. Ward

20  yesterday regarding the timing.  There still remains the

21  other two issues that we responded to in our motion of the

22  duplication of documents as well as the potential for abuse.

23  We've extended the time to allow me an opportunity to get a

24  better handle on what is happening, but there still are two

25  outstanding issues as it relates to the amount of material

1  and the duplication of the material, whether or not any of

2  that material provides or even abuse of processes there.

3  There may be an attempt to obtain documents that weren't

4  allowed in other cases.

5         THE COURT:  So let me ask you, sir, then am I to

6  understand that with respect to the order that's been handed

7  up that your okay with the entry of that order, but obviously

8  the concerns that you have with respect to the mechanics and

9  the scope of the examination will remain live subject to

10  either further negotiation or Court intervention, or are you

11  opposed to entry of the proposed form of order that's before

12  me right now?

13         MR. MCCLARTY:  I have not seen that proposed order.

14  I have the order that was provided as a part of the original

15  motion.  What Mr. Ward and discussed were supposed to be the

16  change of the dates and I am not opposed to the entry of that

17  order.

18         THE COURT:  Mr. Horan, does that sound right?

19         MR. HORAN:  Well, Your Honor, I think what I'm

20  hearing is he's okay with the form of order, but he's

21  pressing the objection.  I'm not sure that I understand the

22  conversation that Mr. Ward had with Mr. McClarty resulted in

23  the language that you see in that order.  And certainly if

24  the Court would like to hear from Mr. Ward he's right behind

25  me.

1    I think that the remaining objections that he talks

2    about, abuse, duplication, to the extent that the trust have

3    objections or assertions of privilege or anything else like

4    that they can assert in response to discovery.  I think

5    that's within their rights and we're within our rights to

6    contest any of those assertions.  I don't think you need to

7    get to those though for the order that's before the Court

8    this morning.

9    THE COURT:  Okay and I think that's consistent I

10   think with counsel for the Trusts observations as well.  Let

11   me at least make my own observations which all of you have

12   heard me make before.  As I understand it the parties agree

13   to the entry of this form of order. I am aware then that

14   discovery will occur pursuant to the terms of this order.  My

15   practice is I think pretty well known and pretty well

16   established. I do not encourage motion practice relating to

17   discovery.  My experience is that it's worth neither the

18   time, nor the paper.

19   If there are issues with respect to discovery and

20   the mechanics of it I would encourage the parties to get me

21   on the phone.  The overwhelming majority of times we can move

22   the ball forward on a phone call.  If it's more complicated

23   than that and I need letter submissions, again it's my usual

24   practice to have that occur in summary fashion and again

25   trying to keep the trains moving.  So I think I understand

1    where the parties stand and I would be prepared to approve

2    and authorize the relief as it's been submitted to me.  Mr.

3    McClarty, is that consistent with your expectations, sir?

4              MR. MCCLARTY:  It is, Your Honor.

5              THE COURT:  Very good.  All right, I have signed the

6    order as it relates to what's been referred to as the

7    Children's Trust.  That will be on the docket shortly.

8              MR. HORAN:   Your Honor, the next item on the agenda

9    is the Committees motion to obtain discovery under Rule 2004

10   from Ascalon LLC.  As I think Your Honor has probably

11   gathered at this stage of the case, Ascalon holds 100 percent

12   of the membership interest in the Debtor.  A very truncated

13   version of the organizational structure set forth on page 2

14   of our brief.

15             THE COURT:  I have it.

16             MR. HORAN:  The subjects on which we're seeking

17   discovery from Ascalon all relate to the Debtors, their

18   assets, their liabilities, the conduct of the case, well the

19   prepetition, conduct of the business.  Before filing the

20   motion as set forth in the motion we did seek cooperation on

21   obtaining discovery.  Those discussions were not successful

22   and it ultimately led to the filing of the motion.

23             The objection from Ascalon is fairly brief.  They

24   assert that the requests are duplicative, but, Your Honor,

25   we're seeking what Ascalon has.  I don't think that it's

1  correct to say that we're seeking the same information from

2  Ascalon that we're seeking from the Children's Trust or any

3  other entity.  We have been before Your Honor with the 2004

4  motion with respect to Mr. Hofmeister.  That has eluded --

5       THE COURT:  Well it's presumable that at least, I

6  mean and again I've reviewed the categories that you're

7  looking at.  I think I understand that some of these

8  documents relating to animating corporate documents, etc,

9  perhaps even things like tax returns, etc, they may be the

10  same documents you're acquiring from different stages, from

11  different levels of the ownership or capital structure.  And

12  so I think the point is well look, I mean if what you want

13  are the management agreements or the LLC, the animating

14  documents and you've already gotten that from these guys, do

15  I have to produce it, stuff like that.  I mean is that part

16  of the dispute that we have?  Do you want to see whether they

17  have the same documents?  Do you want the same document

18  produced?

19       MR. HORAN:  Your Honor, as a practical matter for a

20  certain level of coordination it is required.  I don't think

21  that that's problematic.  I think we do have a right in

22  discovery to see what different parties possess.  And if that

23  leads to the possibility of receiving the same document from

24  one party as another, there is nothing under the rules that

25  would prohibit that result.  I think everybody would like to

1  work towards efficiencies, but we're not having that

2  conversation with the parties right now.

3         THE COURT:  All right.  Okay, response to the 2004

4  motion.

5         MR. BEAMS:  Yes, Your Honor, Kenneth Beams for

6  Ascalon Enterprises.

7         THE COURT:  Welcome.

8         MR. BEAMS:  I think you summarize our position

9  especially the information in the 2004 examination, Exhibit

10  A, they sought from the Debtor.  They sought from the Trust.

11  They seek from George Hofmeister personally.  I mean how many

12  different times is this information need to be produced to

13  counsel for the Creditors Committee.  It's as if they are

14  subpoenaing the owners of the company.  They're subpoenaing

15  employees of the company.  They're subpoenaing the company

16  itself for the exact same information.  I mean how many

17  different times and different ways can they ask for the same

18  stuff is our position.  And not only that some of the

19  information for example, you know, money transferred to that

20  fund has already been disclosed in the schedules.  They

21  already have or will be obtaining this information from the

22  Debtor.

23         THE COURT:  Mr. Horan.

24         MR. HORAN:  Your Honor, Ascalon is not denying that,

25  and generally speaking the scope of what we're seeking is

1  something that we're entitled to discovery on.  Again if --

2        THE COURT:  Well actually I think I would embrace

3  your earlier proposition or observation that this is more a

4  question of coordination then discovery rights.  I have

5  reviewed the 2004 and I'd be prepared to approve and

6  authorize the Rule 2004 examination.  My issue is this, and

7  I'm not trying to complicate anybody's life, as a matter of

8  fact I think my intention and expectation would be that we

9  would ease party's life.

10        These are related entities.  They may be separately

11  represented.  There may be separate considerations, claims,

12  causes of action or defenses that relate to each of these

13  entities at each level.  It is in trying to be practical

14  about this exercise, I've been through the list of what

15  you're looking for, and again I'm not going to do a line by

16  line right now.  I will be available if you need me to do

17  that.  I would prefer not to, but what I'm not going to do is

18  require unless you can give me some reason, I am not going to

19  require that loan documents, if it's the same loan all right,

20  that the trust took out or the trust guaranteed, or the

21  Debtor took out and it's the same book of documents, I am not

22  going to require that Debtor, and Ascalon, and the Family

23  Trust, and Mr. Hofmeister to all produce the same document.

24        Your point that we're entitled to see what everybody

25  has, I guess I accept that as a general proposition, but it

1  would only be I think important and again, maybe I'm getting

2  ahead of myself, but the issue of whether or not everybody

3  has the same document comes up if we have an issue in

4  litigation about who had notice of something.  Did you know

5  what the terms of the loan were?  Yes, why, because the

6  parent entity had it, the subsidiary had it, the shareholder

7  fund had it, these guys all had it.  That's an important

8  question to answer.  I don't know that we're asking that

9  question right now.

10        I think you want the loan documents, and I think you

11  want board minutes, or those kinds of records, tax returns,

12  where are the bank records, etc.  If it's all the same then I

13  think Ascalon can say it's all the same.  Its incumbent upon

14  them to say, you know, we've coordinated because I think he's

15  got an incentive to coordinate.  We coordinated.  The Debtor

16  has produced all bank records.  Ascalon doesn't have any

17  independent bank records.  And we've reviewed what they

18  provided and all that is the same, but you know I'm not going

19  to go print 6,000 pages of bank returns that you've already

20  gotten and I don't think you want that stuff.   Is there a

21  way to square this circle?

22        MR. HORAN:  Your Honor, if the Debtor and Ascalon

23  were to be in a position to have to produce the same exact

24  document, and its hypothetically, if the Debtor provided it

25  to us and Ascalon said this is the same exact thing, page per

1  page, there are no differences.  If we had an affidavit to

2  that effect then we would be in a position to deal with that

3  affidavit.  We would be able to be in a position to challenge

4  it to the extent necessary, but there would be something

5  before Your Honor, but right now, yeah, Ascalon hasn't

6  produced a thing.  And we have not yet received discovery

7  from the Children's Trust.

8         There has been limited discovery that we understand

9  has been made by Mr. Hofmeister that are sitting in different

10 law offices down in Kentucky.  So we need to see these

11 things.  And we'll understand what we have, but right now, or

12 Ascalon sitting as the sole member of this Debtor to stand

13 there pointing and saying, your seeking it from somebody

14 else, don't look at us.  Now you're the ones that we should

15 be looking at and you're the ones we're seeking it from and I

16 think it's appropriate, Your Honor.

17        THE COURT:  Okay, here's what I'm going to do.  I'm

18 going to approve the 2004 motion.  I will make the following

19 observations.  I believe that the Committee is entitled to

20 take the discovery or pursue the examinations.  I think that

21 this is within the ambit of what Rule 2004 contemplates.

22 I've said before many times one of the luxuries that I have

23 in this job is able and experienced counsel that have been

24 through this process before.

25        I expect that there will be a measure of

1  coordination so I want to be abundantly clear that I do not

2  anticipate that the Committee is going to get run around in

3  circles by everybody saying somebody else can produce this.

4  And I similarly don't believe that the Committee will be able

5  to burden or press or oppress each of these parties by saying

6  I got 6,000 pages of bank documents from these guys, I want

7  you to give me the same thing, I want you to give me the same

8  thing, I want you to give me the same thing.

9        And this is nobody's first rodeo.  This is

10 discovery.  I'm ruling that you're entitled to it, but, you

11 know, we've all dealt with this situation whether it's

12 affiliated, multi, multi-entity, corporate families where

13 you've got documents and documents and documents.  People can

14 move this process forward without killing an entire forest.

15 It may be that at the earliest stages of this case we've had

16 difficulties with coordination among the various entities.

17 We have had issues with respect to engagement of counsel and

18 who's running the show.  We've now jointly administered the

19 cases and we have counsel on board now for all of the

20 Debtors.  That doesn't answer the question as to the non-

21 Debtor entities, but you're getting your order. And my

22 expectation is that you'll get the discovery that you're

23 looking for.

24        I think I observed in the inquiry about Mr.

25 Hofmeister's 2004 that I was approving the 2004, but I also I

1  think observed, I haven't gone back and looked at it, but I

2  think I said most of this stuff the Debtor has.  And if they

3  do then that may be the easiest place to get it.  I'm not

4  foreclosing inquiry on any party, but again the question is

5  you need the information.  I believe that you got the wind at

6  your back with the Court finding your entitled to it and now

7  it's a question of the mechanics of getting to it, and to you

8  and to the folks on the other side.

9       The offer remains open.  My hope is that the parties

10 will be able to work through this collaboratively.  That has

11 been my experience in other matters.  And if not get me on

12 the phone, but my experience has been that by being

13 available, it's not my favorite thing to do, but that it

14 helps keep the process moving because somebody doesn't fairly

15 believe that if they file a two page motion for a protective

16 order they bought themselves 30 or 45 days.  They bought

17 themselves till Friday.  And that in some cases is a good

18 thing.  And if it's more elaborate then that then again I

19 will be able to see that to understand that and I'll take

20 submissions from the parties.

21      I believe the Rule 2004 is a tool available.  I

22 believe it is appropriately utilized by the Committee here.

23 So I expect that discovery will occur in a manner that is

24 both appropriate and consistent with pretty well established

25 practice, okay.

1      MR. HORAN:  Yes, Your Honor.

2      THE COURT:  Do you have an order?

3      MR. HORAN:  Yes, we do.  May I approach?

4      THE COURT:  Sure.  Thanks.  I believe we now have a

5  status conference.  Is that the next item?

6      UNKNOWN:  Yes, sir.

7      THE COURT:  Mr. Galardi, good morning.

8      MR. GALARDI:  Good morning, Your Honor.  Your Honor,

9  I guess it's a status conference, but I would rather refer to

10  it as the preliminary hearing.  Your Honor, under the rules I

11  think you have to have a preliminary hearing within 30 days

12  of the filing.

13      THE COURT:  Right.

14      MR. GALARDI:  And we have not agreed to, if Your

15  Honor thinks they can carry their burden to push it over to a

16  final hearing, which I think it is their burden under the

17  rules, and then we would schedule a final hearing.  But, Your

18  Honor, under E 30 day requests Your Honor has to stay is

19  terminated unless they show a reasonable likelihood because

20  we did file it under 365(d), a reasonable likelihood that the

21  party opposing the relief will prevail at the conclusion of

22  the hearing.

23      Now, Your Honor, with respect to this I think we

24  have to put this in particular context.  Your Honor, first

25  and I understand that Ms. Jones will come up here and say

1  she's only been in for X number of days, but the X number of

2  days is still 21 days.  And as Your Honor has remarked there

3  is experienced counsel with experienced professionals who

4  know how to run a case and have had to file cases in a lot

5  less than 21 days.

6          In this Spara case the only motions that have been

7  filed is an extension to file schedules and a motion for

8  joint administration.  As Your Honor is aware they have filed

9  schedules and it's a holding company.  And the only assets

10  they list, which they listed $5 million dollars is stock

11  certificates that have been pledged.  So what's a

12  reorganization of a holding company?

13          We have the pledge of one such stock certificate the

14  one in Lexington, though they list us as an unsecured claim,

15  it's secured at least by the value of that pledge and they

16  can go ahead and contest.  And they have listed in their

17  schedules that we don't have that claim, but with respect to

18  their own schedules they list the value of the equity in

19  Lexington Logistics leaving aside any claims at Spara as $7.2

20  million dollars.

21          So, Your Honor, we go back to 365(d) and there's

22  really two tests.  One, provide us adequate protection or

23  two, show that there is equity in this interest and that it's

24  necessary for reorganization.  Your Honor, I don't think its

25  disputed that they have not with respect to the stock

1 interest shown that any sort of form of adequate protection

2 with respect to our interest in that stock interest.

3 　　　　With respect to the other two elements showing of

4 equity in the equity in assets here or necessary to the

5 reorganization, it's not like as I was trying to say a fleet

6 of trucks and you're a truck leasing company.  It's not like

7 a bunch of stores and you're a retailer.  This is equity.

8 What good is the equity to reorganization?  Well the only

9 good an equity is to a reorganization, and I don't know they

10 might come out with synergy's and everything, if that equity

11 can be turned into cash to pay the Creditor's or buy a new

12 business or do something, Your Honor, all we have really

13 asked for and we have not gotten an answer is why don't you

14 sell this equity?  How is it necessary for your

15 reorganization?

16 　　　　Let's assume there is even equity because we have

17 asked for fairly novel relief in the sense that we'd like to

18 foreclose on our equity interest, but we suggest look, even

19 if there is a dispute, which we anticipated a dispute as to

20 the value of that equity, and say run a sale process.  The

21 best Delaware method I know for figuring out whether there is

22 equity in a security like a stock is to do a market check.

23 Let's run a market check.  If you don't want to do that and

24 you want to just have a battle of experts that's fine, but

25 you already said what the value is, its $7 million dollars.

1   We already have a judgment for the same $7 million.  Either

2   adequately protect us or you don't have equity, but even if

3   you did have equity tell me how having a stock certificate

4   that I have a pledge of is necessary for a reorganization of

5   a holding company.  This is not an operating company.

6         We don't think you passed the preliminary test to

7   extend the stay 30 days on what I believe are uncontested

8   facts.  Now there is a lot of discovery like everything else

9   and they want to know the underlying economics.  And there is

10  going to be a dispute about the IP value.  And there is going

11  to be a dispute about the receivables.  And there is going to

12  be a dispute about litigation.  Okay, those disputes are very

13  easily resolved.  Either you have expert testimony for the

14  next two months or you put the stock up for sale which gives

15  the underlying equity value and we'll know, and if they get

16  cash they get cash.  If somebody comes in and takes us out

17  that's fine to.

18        Your Honor, I think we've come up a way.  They have

19  the Horan person here today, I heard the testimony and I

20  don't know quite what he's done for the last three weeks, but

21  if they want to come and say their business plan is do

22  something with the stock certificate and that the stock

23  certificate is necessary to the reorganization then let's put

24  him on and let him say what exactly their business plan is

25  with respect to the stock certificate to get a reorganization

1  of a company that's been in bankruptcy 75 days, filed two

2  motions, doesn't have counsel retained, doesn't have a DIP,

3  and oh by the way we've offered a DIP, doesn't have any

4  financing and doesn't have a business plan.

5        So, Your Honor, we think that we can go onto the

6  final hearing if Your Honor thinks they passed the burden,

7  but I think they have to first show that they have a

8  reasonable likelihood to succeed in their defense of the stay

9  route.

10        THE COURT:  Okay, Mr. Kornfeld.

11        MR. KORNFELD:  Thank you, Your Honor, for the record

12  Alan Kornfeld for the Debtors.  Your Honor, it's interesting

13  that Mr. Galardi talked about uncontested facts.  Let's talk

14  about some other uncontested facts we have here.  Number one,

15  Mr. Galardi's client Boston Financial has been in procession

16  of this Debtor, in control of this Debtor since the beginning

17  of November.  Boston Financial is a lender in procession.

18  It's running the business.  It's running the business,

19  although we own the business.

20        Boston Financial has not given us any information

21  about the business since the beginning of November.  They

22  have in secret run the business.  It's been a black box.  So

23  although they are in procession of the business allegedly

24  protecting their collateral, they should be protecting their

25  collateral of course, there is no issue that they are in

1  procession, they haven't given us any information which

2  causes a great deal of concern because there are things going

3  on with the business.  Now they have a lot to do with value

4  like some valuable arbitration claims that we thought were

5  going to trial in March that could bring significant

6  recoveries in the eight or nine figures into this Debtor, but

7  we don't know what's going on there because they haven't told

8  us.  And that's an uncontested fact that Mr. Galardi just

9  didn't get around to mentioning.

10        The bottom line here is given that we have a lender

11  in procession that's running the business we not only don't

12  know about these valuable litigation claims, we don't know

13  about the financial results of the business.  In order to do

14  valuation work, going-concern valuation work as opposed to

15  putting down in a schedule a balance sheet number that Mr.

16  Galardi knows is not a true reflection of going-concern value

17  which is what is going to be at issue in connection with the

18  expert testimony.

19        In order to have that valuation trial we need

20  financial information.  We need actual.  We need year end

21  actual.  We don't have those.  We need projections.  We don't

22  have those.  We need copies of contract going forward.  We

23  don't have those.  We can't get any information from this

24  lender in control.  That's an uncontested fact also.  That

25  wasn't mentioned.

1        So what we have here is an aggressive lender who

2   wants to, despite failing to give us any information that

3   would allow us to fully and fairly litigate, we have an

4   aggressive lender who wants to have this Court in essence

5   grant its summary judgment to do what Mr. Galardi fairly

6   characterized as fairly novel relief.  I would submit, Your

7   Honor, what this aggressive lender wants to do is capture all

8   of what we believe is substantial value for itself at the

9   expense of every other constituency in this case, whether

10  that constituency be Creditors or potentially equity;

11  therefore, given the fact that this is a lender in procession

12  there is absolutely no reason and no harm that would result

13  from having this case fully and fairly tried.

14        Let me tell you what the status is.  We have served

15  discovery in order to find out the information we need to

16  provide our expert in order to allow our expert to arrive at

17  a valuation opinion that would be presented at a trial at

18  this matter.  So we have served a document request because we

19  don't have documents.  We've asked for financials.  We've

20  asked for documents related to litigation.  To date even

21  though Mr. Galardi apparently, and I didn't know this, but

22  apparently Mr. Galardi wanted to go forward with a full blown

23  evidentiary hearing today.  To date they haven't given us a

24  single document despite the fact we served the discovery

25  request back on January 22nd.  The responses to be fair are

1   due on February 21st.

2          We would expect that Boston Financial will give us

3   documents. We'll review the documents.  We'll get them to our

4   expert and then we'll start taking depositions.  We've got a

5   30(b)(6) served on Boston Financial.  We've noticed Boston

6   Financials expert witness deposition.  We don't know who that

7   expert witness is yet.  We expect they will have an expert

8   witness on valuation.  We've noticed the deposition of

9   Jonathan Golden, Boston Financials general counsel who is

10  declarent in support of a motion.  And we've noticed the

11  deposition of Boston Financials CEO and COO.

12          Now ironically given what we heard from Mr. Galardi,

13  Boston Financial has also served discovery on us.  They

14  served a set of interrogatories.  They've served the request

15  for production.  Responses to those documents are due on

16  February 28th.  And they have noticed two depositions.

17  They've noticed our expert deposition and they've noticed our

18  30(b)(6).  They've noticed those depositions out for March

19  14th and March 15th.

20          We would submit, Your Honor, that we want to get

21  this matter tried quickly and that a reasonable time to try

22  this trial given the deposition schedule of both of our

23  depositions and Boston Financials depositions, there are

24  about seven depositions in total.  Assuming Boston Financial

25  complies with the document requests and gives us the

1  necessary documents on or before February 21st, we would

2  submit that we do depositions in March in either the last

3  week in March, the first week in April.  We have an

4  evidentiary hearing where everybody can fully and fairly

5  provide the Court with evidence.  The evidence the Court will

6  need to make adjudication as to this fairly novel relief that

7  Boston Financial ask.

8       Again we want to get this done as quickly as

9  possible, but given the depositions that are noticed and

10  given the fact that we have very limited financial documents

11  that what I'm proposing is a reasonable schedule.

12       THE COURT:  Let me ask and this is kind of a broader

13  question, and Mr. Galardi will have an opportunity to respond

14  as well, he acknowledges that this is fairly novel relief.

15  And the issue here is a valuation question, okay, of a

16  corporation.  This is where we are going kind of broad, but I

17  would appreciate you spend a lot of time in front of me in

18  different contexts, so has Mr. Galardi.  Every time I do a

19  valuation hearing I tell myself this is the last time I'm

20  going to do it.  And the reason is as I look out you are all

21  looking at the least qualified person, the least informed

22  person taking information through the SIV or the narrow focus

23  of the rules of evidence, etc.

24       There's a terrific article by Bernstein and somebody

25  else where it talks about the fact that the Bankruptcy

1  valuation process is a less than ideal mechanism, all right,

2  because it trends the Court or a judge for extremes.  And

3  when you sit up here and you listen to a qualified expert say

4  that the business is worth $350 million dollars and another

5  equally qualified expert says it's worth $2.1 billion, you

6  have this deep seeded feeling that its somewhere in the

7  middle, but I can't articulate why and I certainly can't

8  articulate in a way that's likely to be highly respected on

9  appeal.

10        I'd honestly like your thoughts on it.  I mean we're

11  talking about the mechanics of this.  And to the extent that

12  anybody has got their hopes up, I'm not granting a motion for

13  relief from stay or for adequate protection today.  This is

14  teed up as a preliminary hearing or status conference and

15  we're going to move the ball forward, but I would like your

16  thoughts on it.  And I may not dispose of this question

17  today, but I will tell you that I mean I struggle with these.

18  You get them and you are trended toward extremes.  We are

19  given matters to decide that according to the law are sort of

20  right within our wheelhouse, but there are a lot of other

21  things that I decide with a great deal of more confidence

22  then questions of valuation.

23        His point is, to quote Judge Walsh, "you know what

24  something's worth, what a willing buyer will pay to a willing

25  seller in a fair and open market process."  That is what its

1 worth, not whatever number an expert will peg or whatever

2 number I can pull out of the air.  That is a long speech so

3 go with it.

4 　　　　MR. KORNFELD:  Your Honor, you've almost asked an

5 existential of valuation question.

6 　　　　THE COURT:  I have.  I don't get to talk to anybody

7 back there, so you're here.

8 　　　　MR. KORNFELD:  I happen to think that the Bankruptcy

9 Bench, in particular the Bankruptcy Bench in Delaware does an

10 excellent job on valuation trials.  As you know I've done a

11 significant number in front of this Court and other Court's.

12 And I believe that the Court's do a fine job in listening to

13 experts and coming to a conclusion, and weighing the

14 evidence, and being able to understand where an expert

15 opinion is an opinion that is based on reality and

16 projections that can be supported etc.

17 　　　　The bottom line is given the Bankruptcy context I

18 think valuation, fortunately for some of us that make a

19 living doing it is an important part of the process.  If

20 Congress had wanted us to have a sale every time a valuation

21 dispute arose the code whether it be in connection with

22 confirmation or otherwise in connection with stay relief or

23 other areas where it comes up would have been written in a

24 very different way.  So I think we're in a valuation arena.

25 　　　　I think given the inherent issue of expert

1  testimony, the Court has hit the nail on the head about the

2  difficulties of weighing that evidence, but I think this

3  Court is uniquely equipped to do that.  And I think the

4  valuation test in this case will be to some degree not as

5  complex as other cases because what Boston is contending is

6  that the Debtors can't get over a $7 million dollar hurtle

7  here.  Boston's debt at this level is a $6 million dollar

8  principal which Boston contends is with fees and costs closer

9  to $7 million dollars.

10          Boston based on its declaration from Mr. Golden says

11  that the Debtors can't overcome that hurdle.  The Debtors

12  believe that they can overcome that hurdle by a significant

13  amount.  So if we're talking about getting over a $7 million

14  dollar hurdle I don't believe that this will be as complex as

15  other matters that the Court might hear in connection with

16  confirmation for example, but there will be experts on each

17  side.  And there will be percipient witnesses talking about

18  projections on each side.

19          I think my sort of long answer to that existential

20  question is that the Court can do it.  Obviously a sale is

21  going to tell you where value is based on assuming an open

22  process and a process designed to maximize value what a

23  willing buyer will pay, but sometimes in the context of where

24  we are in a case that's not a viable alternative for a

25  Debtor; although, for a Creditor a foreclosure might be a

1  viable alternative.  We believe maximizing value right now is

2  does not mean a sale. It certainly doesn't mean a foreclosure

3  by Boston Financial.

4       THE COURT:  Let me get Mr. Galardi's thoughts on it,

5  on the question pending.

6       MR. GALARDI:  Your Honor, I'm not going to blow

7  smoke.  And I'll be Kierkegaardian.  I think you, you've

8  asked the question, this is why I think we made the motion.

9  This is not the valuation of a business first of all because

10  the underlying business, and let me start with he said it was

11  uncontested, we won't produce documents.  That is simply not

12  the case.  We are going to produce documents.  And if there

13  was a sale process, Your Honor, we would have to produce the

14  underlying financial so people could take a look at the

15  business to get the highest value.

16       We would love to be paid off in fall, so let's start

17  with that.  With respect to this business and I think the

18  gentleman knows this, even the underlying company and again

19  there's controller and they know the records from the past.

20  Its only like $3 or $4 million dollars so no multiple is

21  going to clear their debt of $21 to $22 million dollars plus

22  our 750.  The real valuation issue here, and that's why I

23  said it in my presentation is there is a litigation claim.

24  And how many times has Your Honor heard the recovery to

25  Creditors and the recovery to equity is going to be the value

1  of a litigation claim and the value of IP.

2       It's not going to be a business valuation where you

3  take a multiple and you take the four different methods of

4  doing a business and come up with multiples.  That's going to

5  be one element, but that's not going to clear even the hurdle

6  down at the Lexington.

7       The real issue is, is this litigation going to yield

8  something greater than $40 million or is it going to yield

9  zero.  Is the IP worth in a sale scenario or some other

10 scenario because they don't own the IP, it's the IP down at a

11 non-Debtor entity.  Is it? How do you realize it?  The only

12 way you realize on that is either go to Court in litigation,

13 and he mentioned a March date, get that litigation all the

14 way through, get a judgment.

15      So what you're going to hear is expert testimony not

16 what the Bankruptcy Court always hears.  You'll hear the

17 business valuation like you do on confirmation of the value

18 of the enterprise, but there are two contingent assets here

19 that are going to be hotly disputed.  And whether you can get

20 true expert testimony on what you realize on a litigation

21 claim with respect to a breach of contract in a Court that's

22 going to be put in front of Your Honor.  And then the other

23 part is well what's the IP, but you can't separate the IP

24 from the business.  So how do you value that IP down at the

25 business to get to equity?

1          Again, Your Honor, I think that's why a sale, and

2    you and I both were raised with Judge Walsh, a sale over a

3    process, over a period of time, this is now April, if we go

4    to the April hearing a sale process in that same timeframe,

5    nearly 60 days with information gives you and the Court, the

6    Court and all the Creditors the best access to a value.

7          THE COURT:  Well as you might imagine from my long

8    and looping question, I mean this is something that I've

9    thought about a lot.  And you know I was being a little bit

10   flip.

11         MR. GALARDI:  That's why we laid it at your

12   doorstep.

13         THE COURT:  And I was being a little flip with Mr.

14   Kornfeld saying, you know, I sit up here and every time I do

15   it I think I'm not going to do it again, but that's actually

16   true.  I mean it's an immensely frustrating exercise.  And

17   while I appreciate the ataboy that we're good at it, I would

18   say the same thing if I were standing at that podium.

19         MR. GALARDI:  Right.

20         THE COURT:  So we'll leave that issue aside, but

21   this is a somewhat different context.  The idea of almost a

22   forced sale is a different animal then the context where I am

23   asked to value a company between seconds and thirds.  You got

24   a second lien, third lien, and the second say we're the

25   fulcrum, there is no value for the thirds.  And the answer is

1  okay, why don't I let the thirds see if they'll buy it or

2  somebody else and maybe they'll be value.

3        And in a planned context it seems that I can almost

4  do that.  I can embrace a parallel path and say, you know

5  something sell or recap it, either way, and if you don't get

6  any bids, you don't get any bids.  And if you do get bids

7  then you've answered your question and kudos to you, but it

8  is anomalous to me to turn to a Debtor and say this is an

9  asset and I'm requiring that you sell it absent relief from

10  the stay where I sort of hand the asset to a Creditor who

11  demonstrates that it's his collateral and he gets it.

12        MR. GALARDI:  But Your Honor, again in this

13  particular I think you're missing the following with respect

14  to this.  One, they have a burden under the standard to show

15  there's equity.

16        THE COURT:  Right.

17        MR. GALARDI:  Two, they have a burden to show

18  somehow that this stock interest is necessary for a

19  reorganization.  That's different.  Three, you have a secured

20  lender and we put our documents in and are prepared to do it,

21  we're prepared to make a bid to start the auction process and

22  give you information.  We can put a bid in today on that.

23  Now I can make a hostile bid and a takeover bid, and we can

24  make them have fiduciary duties to maximize value.  We've

25  offered a DIP to fund this process.  We have offered to do

1   that.

2          So we could do that, but again the difference is

3   with a UCC sale, and you can go through the lift stay process

4   and we can go through the valuation, and then I foreclose,

5   but isn't the fastest way to see whether that process

6   because, Your Honor, to lift the stay has to make a

7   determination either adequately protected by an equity

8   cushion.  They haven't suggested that or they're suggesting

9   it or there's equity beyond my interest and it's necessary.

10  There is a very simple way and all we are saying in either of

11  those tests you got to show equity.

12          Here's a very simple one.  Let's assume we go

13  through the process and they show equity, well then they've

14  satisfied that you can't lift the stay and we have to sit

15  there and they'll have to give us adequate protection.  It's

16  very simple.  That 60 day process instead of experts, which I

17  don't know how they're going to fund it out of Spara again, I

18  go back to the fundamentals.  How do they fund this?  Who's

19  doing it in the retention?  That is going to be a burden on

20  this estate where a sale process, where you say we should see

21  this test of value, I can determine in 60 days whether they

22  will lift the stay when I see this process, I don't have to

23  require the Debtor to consummate the sale.  If the Debtor

24  shows there is an equity value they can give adequate

25  protection.  If the Debtor can't show that and BFG is

1  prepared to credit bid its claim --

2      THE COURT:  Doesn't the process get a little bit

3  hamstrung because I mean you heard me quote it, we've all

4  heard it, you know, that the value of an asset is what a

5  willing buyer pays to a willing seller in an open and fair

6  process.  But isn't that process necessarily hamstrung if the

7  Debtor is not a willing participant in that exercise, not

8  that they wouldn't do what I told them to do, not that they

9  wouldn't market or invite offers, but rather whether or not

10  you're going to get an enthusiastic bidder who is competing

11  arguably against a Debtor saying that there is value there

12  such that the marketing effort while, Your Honor, its giving

13  you a context within which to rule on the motion, as a

14  practical matter its otherwise been a fool's errand.

15      MR. GALARDI:  Well I don't think so because the

16  Debtor or you talk about the equity member, the same way you

17  deal with second and third lien Creditors or first or second

18  lien Creditors.  All you have to do is buy the equity for a

19  dollar more then what the secured claim is, then we're done.

20  It's the same thing.  You've just taken a secured Creditor.

21  Your same exact argument as to why you are comfortable in a

22  plan between second and third lien Creditors, one party

23  credit bids.  I can start at a dollar with my debt and go up

24  to $7 million and at that point I have to shut up because

25  somebody is going to pay more than the full value.

1          What is the Debtors interest here?  If the Debtor

2     believes that's the value, go out and sell like hell the IP

3     claim and say if you buy this equity, just like Mr.

4     Hofmeister did, you have all these benefits and you this

5     underlying business.  Take them out of their debt.  And by

6     the way we actually made the hurdle less because if you buy

7     the equity --

8          THE COURT:  What's the downside to you though?  I

9     mean you're a confident guy.  You're standing at the podium

10    saying I am going to demonstrate that if they've got no

11    equity and that it's a holding company it's not necessary for

12    the reorganization here.  You know, I'm going to win if you

13    set it up for a sale.  Is it a question of what's a more or

14    less painful exercise?

15         MR. GALARDI:  Well I think it's a doubly painful

16    exercise if you do it the other way.

17         THE COURT:  Welcome to my world.

18         MR. GALARDI:  Well I'm only letting you go through

19    one hopefully.  One is simply Your Honor knows what's going

20    to happen and I don't need to disparage any experts, but

21    they're going to have a value that's high, we're going to

22    have a value that's low.

23         THE COURT:  That's been my experience.

24         MR. GALARDI:  It's the fact.  And it's going to come

25    down to a bunch of contingencies.  Your Honor's inclination

1  is always [indiscernible] so they are interested to go as

2  high as possible.  It's like when you start with negotiations

3  and ours is to go as low as possible.  I'm not saying experts

4  do that.  There will be valuation here, Your Honor, but that

5  is one aspect.

6       And then let's assume we prevail.  Then you lift the

7  stay and we have to go through the exact same process again,

8  this time in a UCC sale which we have said to make sure it's

9  a process that everybody and all Creditors are comfortable

10 with.  How about in the Court?  The UCC says I can put it

11 anywhere, if I get to foreclose, we can put it in a time,

12 place that is reasonable as long as we give notice.  We've

13 said let's go beyond that, let's go to what the Bankruptcy

14 Court does, give the broader picture.  You can do a UCC sale

15 and a private sale in 10 days in my office, in some place and

16 as long as I give notice that's a problem.  We said let all

17 the Creditors see it.  We wanted, you know, a complete, open

18 process for that.

19      So if you do this, then one, let's assume we win.

20 Two, the value may have decreased over that time.   And then

21 three, we have to do the sale process again for whatever

22 another 30 days of the process.  Why we like the process we

23 suggested to you is one, you keep jurisdiction over us.  Two,

24 if there is an issue about us producing documents necessary

25 to maximize that value that's a burden we're willing to take

1  and provide the documents so that people can put out like

2  their own teasers or things like that.  And three, if the

3  Debtor really thinks that this is critical to their

4  reorganization, let them go 60 days, find that there's value

5  there and then explain why in this business plan holding that

6  stock interest as opposed to cashing in for the cash that

7  they think they might have, why that's better.

8        That 60 days frankly is beyond the 120 for filing a

9  plan and disclosure statement.  So all of this can fit nicely

10  into the Bankruptcy timeframe if we want to do a valuation

11  and have a fight on that to, but I think a market check at

12  least during this process gives at least Your Honor another

13  anchor for the valuation because one of the elements of any

14  valuation of any business is going to be what that willing

15  buyer and seller will do as opposed to the math exercise.

16        THE COURT:  I have to tell you I'm really, really

17  tempted and I'm not doing it.  And to be honest --

18        MR. GALARDI:  You want to do it next time.

19        THE COURT:  I really do.  And again I'm being a

20  little bit flip, but I am concerned that I frankly

21  acknowledged the wisdom of what you are observing from the

22  point of view first of Court resources in a selfish context,

23  but second the confidence in the exercise.  It comes with

24  this job.  I place tremendous confidence in the market place,

25  but I'm not confident right now.  I actually am concerned

1 that pursuing the path that you've described would have me

2 re-writing Section 362(d) or at least how Court's would deal

3 with it. I am more comfortable with that if I were to embrace

4 it in a flexible context of 1129 on all I could do under a

5 plan and maybe even 364.

6       I actually believe what I am faced with right now is

7 a substantial prepetition judgment Creditor that's asserting

8 a security interest that is seeking relief from the stay to

9 pursue its remedies.  I understand the thought process.  And

10 it may be that they will take either a vigorous or a

11 deliberative approach to the market test, but I presume that

12 if we're talking about the value of the asset some

13 understanding of what the market would be for that is part of

14 my analysis, and part of their case and presumably part of

15 yours as well.

16       I believe what we're dealing with is a Section

17 362(d) question seeking relief from stay.  I think the code

18 and the case law give us guidance as to what the contours of

19 that hearing are.  It seems to me that the timeline that

20 parties have talked about is about as quickly as I think the

21 parties could expect to bring it on in March or in early

22 April.  And I can give you confidence that I can accommodate

23 that on my schedule.  I would prefer not to set that hearing

24 right now, but rather the parties confer with respect to the

25 mechanics of discovery, briefing their witnesses, etc and

1  then we can talk about or I will give you timing and

2  timelines for that hearing.

3          The step about simply setting this up for a sale or

4  basically proceeding down that path, I think I understand

5  precisely what you are describing.  And it's not something I

6  am prepared to embrace at this point.

7          MR. GALARDI:  Your Honor, with respect to the

8  hearing we can talk, but I think we've spoken at this and

9  since the code provides our consent to go beyond another 30

10  days I think it is, is there a hearing date?  And I think we

11  can look back on the discovery from what Debtors counsel has

12  said.  Is there a hearing date in that first week of April

13  that you might have so we can work that.  And then obviously

14  parties are free if we don't produce documents or they don't

15  produce documents to come back and seek a further extension

16  of that date, but I'd love to get your calendar and work

17  backwards from yours because yours is usually more full.

18          THE COURT:  How about April 3.

19          MR. GALARDI:  April 3.

20          THE COURT:  I'll give you all day.

21          MR. GALARDI:  Why don't we tentatively say yes to

22  that unless you have an objection to that?

23          THE COURT:  That works.

24          MR. GALARDI:  Okay and then we'll work on a

25  schedule.

1   THE COURT:  I'll leave that to you folks.  You know

2   your schedules better than I do.  There are issues with some

3   holidays and I assume spring break and things like that, but

4   that seems to me to be a reasonable timeline for the issues

5   that are getting hammered out between the parties.

6   MR. GALARDI:  Okay, thank you very much, Your Honor.

7   THE COURT:  Okay, Mr. Desgrosseilliers.

8   MR. DESGROSSEILLIERS:  I am going to speak because

9   we filed a reservation of rights.  Our concern here and Your

10  Honor heard it from Mr. Galardi as well is that we are

11  talking about hiring a couple experts.  We are talking about

12  two months of discovery.  We are talking about a lot of

13  things.  And I think what we aren't talking about and what we

14  haven't talked about yet at this hearing, and it's something

15  we have been trying to get from the Debtors now since we've

16  been around, which admittedly has been longer then Ms. Jones

17  has been around.

18  THE COURT:  Sure.

19  MR. DESGROSSEILLIERS:  Where are these cases going

20  and why are we spending all this money.  And I know we just

21  filed a Trustee motion and that's a lot of money, and is

22  there a better way to do this.  And I have yet to hear, and

23  we have yet to hear from the Debtors or from here on from

24  anyone where these Debtors are going.

25  We have three administrative lien insolvent cases

1  right now, Your Honor.  We have one case that is actually

2  generating some money here Greenwood, but its losing money.

3  So it may not be administratively insolvent, but it's not

4  doing real well.  So, you know, I hate to take us down from

5  the metaphysical point of talking about valuations here, but

6  I am going to take us down to the practical point of we

7  represent unsecured Creditors in the Revstone matter for now.

8  We would like to see those unsecured Creditors get some

9  recovery.

10      We do not see this Debtor progressing anywhere

11 towards getting these cases on a track where we can say

12 here's the plan.  And I think, you know, we don't support Mr.

13 Galardi's clients requested relief, our chairman's requested

14 relief.  You know, we filed our reservation rights.  We need

15 additional information if this is the path we're going down,

16 but to us sitting here as Committee counsel it makes more

17 sense for folks to figure out what we're doing with these

18 cases.  We're all under confidentiality agreements.  We know

19 some stuff.  I don't know if we can do this in open Court,

20 but we got to figure out where these cases are going or we

21 can just litigate them to death.

22      I mean Your Honor heard on the first day I think

23 there's 4,200 people who have jobs here.  It is not our

24 intention to destroy 4,200 jobs by doing this process.  In

25 fact it would be preferable to preserve 4,200 jobs if we can,

1 but at least get some value out of these cases.  And we are

2 not heading towards getting value out of these cases.

3        THE COURT:  Well I'm not going to, if the Debtor

4 wishes to respond the Debtor can.  I'm not going to require

5 that the Debtor respond.  That's obviously a baseline

6 consideration is where we are headed with this.

7        The fact is that these cases have been marked by,

8 and Mr. Jones noted it, have been marked by conflict from the

9 outside.  So be it, there are cases that proceed that way.

10 You've all heard me say a hundred times that perhaps the

11 paramount consideration that I have with irrespective of

12 whatever the code tells me, is the real interest of the

13 employees of the company.  That is a consideration that, you

14 know is first and foremost in my mind.

15        I am acutely aware of risk to any company from

16 disarray in a litigious Bankruptcy case.  And to the extent

17 that I need to and to the extent that I can I will endeavor

18 to move the cases forward.  Parties have their rights.  The

19 Committee has its rights to seek relief, to seek a status

20 conference to try to move the matter forward.  It does seem

21 to me that this matter is not at least presently postured to

22 be susceptible for mediation or anything like that.

23        I actually think that this is to take your point; I

24 think that you are in a position now where the cases are

25 becoming a little bit more mature and there is able counsel

1  and professionals that ought to be able to sit down and talk

2  about it.  Whether consensus is achieved or not is something

3  that I cannot control, but I would prefer that parties not be

4  whistling in the dark about whether or not the cases are

5  headed in one direction or another.  And I share your concern

6  with respect to dissipation through fragmented litigation.

7  It is a concern and I will be cognoscente of it.

8         Right now I don't think that there is anything

9  further before me to deal with today.  I am aware of the

10 point and you may consider well puissant.

11        MR. DESGROSSEILLERS:  Thank you, Your Honor.

12        THE COURT:  All right, Ms. Jones, do we have

13 anything further today?

14        MS. DAVIS-JONES:  No, Your Honor, there is nothing

15 further.

16        THE COURT:  Mr. Brown.

17        MR. BROWN:  Thank you, Your Honor.  Your Honor, we

18 were last here on the Greenwood Forgings case.  And at that

19 hearing on behalf of Boston Finance we requested adequate

20 protection.  One form of which was the ability to gain access

21 to the business and the knowledgeable personnel in order to

22 get information.

23        THE COURT:  Right.

24        MR. BROWN:  Last week Your Honor denied that request

25 as you will recall.  Last week we sent some information

1  requests over to the Debtors and we have yet to hear a

2  response.  And Your Honor invited us to reach back to you if

3  we were encountering any problems getting information.  And

4  so I am at least putting on the table at this time that if we

5  don't hear anything further in the next day or so we may be

6  reaching back out to Your Honor.

7          THE COURT:  Ms. Jones.

8          MS. DAVIS-JONES:  Thank you, Your Honor.  Sorry to

9  bother the Court with this issue.  Your Honor, we did receive

10  a request by e-mail to me late Thursday with respect to

11  Greenwood and getting some financial information.  We

12  immediately forwarded that onto Huron.  We are working

13  through it with Huron.  Mr. Brown knows my partner Mr. Litvak

14  who has been handling that.  And Mr. Litvak will be talking

15  to him about that.

16          THE COURT:  All right, I'm sure you've seen the

17  transcript from that hearing.

18          MS. DAVIS-JONES:  I did.

19          THE COURT:  I haven't look at it, but I recall

20  making observations that my recollection was that Mr. Brown

21  you wanted somebody on site or that's how I construed it.

22  And I didn't think that that was appropriate, but as a

23  significant secured Creditor you are entitled to information

24  and you know the drill.

25          MS. DAVIS-JONES:  Your Honor, it turned out to be

1  quite an elaborate request for information, but given where

2  this case has been and to Your Honor's point made earlier I

3  have been exceedingly liberal in my direction on our side to

4  be providing information.  And that is the direction that's

5  happening here.

6          THE COURT:  Mr. Brown.

7          MR. BROWN:  I was just standing in case Your Honor

8  at least referred to me and I wanted to be polite to the

9  Court.

10          THE COURT:  I'll let that process play out.  Okay,

11  anything further today?  Stand in recess.  Thank you very

12  much.

13          [Court Adjourned]

14

15                    CERTIFICATE

16  I certify that the foregoing is a correct transcript from the

17  electronic sound recording of the proceedings in the above-

18  entitled matter.

19  /s/Mary Zajaczkowski                    February 7, 2013

20  Mary Zajaczkowski, CET**D-531                Date

21

22

23

24

25